IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| GORDON C. SPURGEON, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 07-3118-CV-S-ODS |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) |
| Defendant. | ) |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits and Supplemental Security Income benefits. The Commissioner's decision is affirmed.

## I.  BACKGROUND

Plaintiff was born in 1963 and has a tenth grade education. He has prior work experience as a roofer, painter, and security guard/traffic monitor. He protectively filed his applications for benefits under Title II and Title XVI of the Social Security Act on August 9, 2001, alleging a disability onset date of May 23, 2001, following a motorcycle accident. The applications were initially denied. In a decision on July 16, 2003, following a hearing, an Administrative Law Judge ("ALJ") found Plaintiff was not under a "disability" as defined in the Social Security Act. On September 25, 2003, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. Plaintiff then appealed to the United States District Court for the Western District of Missouri, which remanded the case for further proceedings on June 14, 2004, pursuant to the Commissioner's request. Two additional hearings were held and a new decision of the ALJ was issued on February 22, 2006, also finding Plaintiff was not under a disability. The Appeals Council denied Plaintiff's request for review on February 23, 2007. The decision of the ALJ stands as the final decision of the Commissioner.

Plaintiff sought treatment from St. John's Regional Health Center on May 23, 2001, for injuries sustained in a motorcycle accident. He sustained a Colles fracture of the left wrist, a nondisplaced fracture of the left lower hip bone, and a strain of the left abductor muscle group. Plaintiff's wrist was casted (Tr. 376, 380). A return visit to the treating doctor on July 27, 2001, following removal of the cast, found no point tenderness or difficulty moving his fingers. However, because the exam also revealed limited pronation/supination in the left upper extremity, Dr. McMurray recommended occupational therapy (Tr. 407). Plaintiff attended one therapy session, and then stopped, stating he didn't think it would do him any good (Tr. 414).

On November 13, 2001, Plaintiff presented to Dr. Ronald Pak. Plaintiff complained of persistent numbness in his fourth and fifth digits, weakness in his left hand, and pain in his wrist. Dr. Pak observed that Plaintiff was in no distress. He noted Plaintiff showed "limited effort" with hand intrinsic strength testing (Tr. 414). On December 3, 2001, Dr. Pak performed nerve conduction studies to check for ulnar nerve dysfunction of the left arm (Tr. 412). On January 23, 2002, Dr. McMurray performed a release of the ulnar nerve at Guyon's canal (Tr. 504).

On December 6, 2002, Dr. Rick Casey, D.O., diagnosed Plaintiff with chronic and acute back pain and generalized anxiety disorder (Tr. 446-50). He also diagnosed Plaintiff with fibromyalgia based on his chronic pain (Tr. 729-32); however, diagnostic signs of fibromyalgia were not documented in the treatment record. On March 4, 2003, Dr. Casey completed a Medical Source Statement, in which he opined that Plaintiff had very significant physical limitations. However, Dr. Casey did not provide any medical clinical findings to support his conclusions (Tr. 715-18).

Plaintiff was evaluated by Ahmed Robbie, M.D., a neurologist, in April and June of 2003. Plaintiff complained of difficulty concentrating, inattention, memory loss, anxiety, depression, generalized weakness, and fatigue. Dr. Robbie reported that these symptoms were consistent with post-concussive syndrome caused by head injuries sustained in 1988 and 2001 in motor-vehicle accidents (Tr. 509-11). Dr. Robbie stated that abnormalities on an electroencephalogram ("EEG") were consistent with a possible seizure disorder and mild encephalopathy (Tr. 720).

Plaintiff went to the emergency room multiple times for alleged anxiety (Tr. 766, 772-73, 780, 786). Plaintiff was also hospitalized for treatment of a drug-related state of confusion from July 3 to July 6, 2003. Plaintiff tested positive for benzodiazepine. Plaintiff alleged memory loss, but treating physician Julie Warren, M.D., observed his memory problems seemed to be more of a motivational issue in completing the testing. She estimated Plaintiff's intelligence to be in the average range (Tr. 735, 739).

On October 3, 2003, a psychiatric evaluation was performed by the Burrell Adult Crisis Stabilization Unit. The mental status examination showed Plaintiff to be alert and oriented to time, place, and person. His speech was normal, his intelligence was average, and his memory was intact. His mood was mildly depressed and irritable with constricted affect. He was diagnosed with major depressive disorder, anxiety disorder, cannabis abuse, personality disorder, chronic back problems, seizure problems, fibromyalgia, and other severe psychosocial and environmental problems. He was found to have a Global Assessment Functioning ("GAF") score of 40 to 45 (suggesting need for outpatient counseling) (Tr. 796). In another evaluation performed on October 28, 2003 by Dr. Tomas Espinosa, Plaintiff was diagnosed with psychosis secondary to head injury and dysthymia (Tr. 844).

Plaintiff saw Dale Halfaker, Ph.D., a neuropsychologist, for assessment on October 9, 2003. Plaintiff told Dr. Halfaker that he did not use alcohol or drugs, which is inconsistent with other record evidence. A standard neuropsychological battery of twenty-two tests was administered, including an IQ assessment. Plaintiff's Full Scale and Performance IQ's both scored at 68. Plaintiff was diagnosed with probable pain disorder, post-concussional disorder, major depressive disorder, and a personality disorder NOS, with paranoid, narcissistic and schizotypal features.

Dr. Halfaker observed Plaintiff to be awake, alert, and oriented. His attention and concentration were adequate for the situation. His recall was appropriate, and his reasoning was literal and concrete. On all of the objective tests measuring symptom validity and effort, the results indicated either borderline or lack of consistent effort. Dr. Halfaker stated that there was a "high" probability of suggestibility, symptom magnification, and malingering. Plaintiff refused to comply with some of the testing

procedures and completely refused some assessment techniques. Dr. Halfaker stated that "[o]verall, this data set appeared to likely be significantly affected by symptom magnification, possibly in the form of malingering" (Tr. 852-72).

Plaintiff had a brain magnetic resonance imaging ("MRI") scan on October 13, 2003. The scan revealed a "tiny" abnormality in the left putamen with a small focus of enhancement that possibly represented a small infarct (Tr. 803). Dalia G. Miller, M.D., a neurologist, opined that the very small infarct did not explain Plaintiff's alleged symptoms of anxiety and headaches (Tr. 806).

Plaintiff was hospitalized on October 28 and 29, 2003, at the Cox North Psychiatric Unit, but left against medical advice without treatment. The physician observed that Plaintiff did not seem to be very disturbed physically or mentally. Plaintiff denied the use of street drugs, yet blood tests showed the presence of opiates, benzodiazepine, and marijuana (Tr. 841, 844).

On February 12, 2004, Plaintiff saw neurologist Steven Otto, M.D. Dr. Otto described Plaintiff as irritable, rude, and insulting. Dr. Otto reported that Plaintiff's chief complaint was epilepsy, but that he provided minimal medical records. Dr. Otto stated that Plaintiff's "story is all over the place" when describing his past seizure activity. Plaintiff's neurological examination was completely normal, including orientation, attention, concentration, language, memory, general knowledge, praxis, affect, and thought. Plaintiff's motor skills, gait, coordination, and sensation were all normal as well. Plaintiff had no musculoskeletal complaints (Tr. 915-17).

Plaintiff was seen by Barbara Radovanovich, Ph.D., a psychologist, on March 1 and 2, 2004, for psychological assessment. Plaintiff provided Dr. Radovanovich with no background medical records; she indicated that Plaintiff was the source of the information in the report. She also stated that Plaintiff had referred himself for the evaluation because he thought it might help to document his cognitive problems. He reported to Dr. Radovanovich that he had been having difficulty with medical and social services in getting the help he believed he needed. Plaintiff scored in the second percentile in cognitive functioning. Dr. Radovanovich opined that his deficits were likely a result of the head traumas he described. Dr. Radovanovich strongly recommended

4

Plaintiff continue pursuing vocational rehabilitation and assistance from social services (Tr. 921-23).

Plaintiff was hospitalized from February 21 to February 27, 2004. He was diagnosed with major depression, chronic and recurrent, without psychosis, and moderate in severity. However, Plaintiff was also found to be well-oriented. Plaintiff was found to have an average to above average intellect, based on his interactions, conversation, and basic fund of knowledge (Tr. 963-65). Upon release, Plaintiff reported to the Burrell Center, but left without treatment when he learned that the institution would not provide him with housing (Tr. 921). From May 15 to May 18, 2004, Plaintiff was hospitalized while in Oklahoma for depression (Tr. 933-34). Plaintiff was again hospitalized from June 1 to 4, 2004, because he was hearing voices and having suicidal thoughts. On June 4, he was found to be stable, with a GAF of 70, and was released (Tr. 953).

On February 2, 2005, Plaintiff saw Tim Frederick, M.D., a neurologist. Dr. Frederick reviewed Plaintiff's MRI and stated that it did not support Plaintiff's alleged symptoms of headaches and anxiety (Tr. 947).

At the hearing, Plaintiff testified that he experiences anger and depression, with daily mood swings. He stated that as a result, he is unable to get along with people, including family, friends, and neighbors. In addition, he complained of daily headaches and an inability to concentrate.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v.

5

Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

      The ALJ found Plaintiff had the severe impairments of post-concussion syndrome, history of seizure disorder, depression, anxiety, somatoform disorder, personality disorder, and drug and alcohol abuse. The ALJ also assumed that fibromyalgia syndrome may have been present and may have reduced Plaintiff's functional capacity in combination with his other impairments, despite the fact that Plaintiff provided no diagnostic documentation or treatment records for the condition.

      The ALJ noted that in Plaintiff's first hearing before another ALJ, a medical expert had testified that Plaintiff could only occasionally use his left upper extremity. However, at the supplemental hearing, though asked to detail all impairments limiting his ability to work, Plaintiff did not refer to such limitation, and mentioned it only after prompting from his attorney. The ALJ also noted that Plaintiff's daily activities included riding a motorcycle, an activity requiring the near-continuous use of both hands. Nonetheless, the ALJ assumed Plaintiff had some reduction in his ability to sustain use of his left upper extremity.

      While the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms, he found Plaintiff's statements concerning the intensity, duration, and limiting effects of these symptoms to be exaggerated. The ALJ based his credibility determination on medical records noting Plaintiff's likely malingering and overstatement of symptoms. Additionally, the ALJ noted that Plaintiff was not highly motivated to work, with a spotty work record even before his alleged disability onset date. Plaintiff does not argue that the ALJ's credibility determination was erroneous.

      The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. However, he found that Plaintiff was unable to perform his past relevant work as a roofer, painter, and security guard/traffic monitor due to his seizure

6

disorder and drug abuse.  The ALJ found Plaintiff did have the residual functional capacity ("RFC") to perform a wide range of unskilled work.  More specifically, Plaintiff was not found to be limited in most physical activities, other than frequent or repetitive gripping and handling.  The ALJ found that his seizure disorder required minimal exposure to certain environmental stimuli.  Additionally, the ALJ found that Plaintiff's mental impairments limited his ability to respond appropriately in highly competitive work environments, to concentrate at sustained high levels, and to maintain prolonged personal contact with the public or co-workers.

The ALJ consulted a vocational expert to help determine the extent to which Plaintiff's limitations eroded the unskilled light and sedentary occupational base.  The vocational expert was asked whether jobs existed in the national economy for an individual with the claimant's age (a younger individual), education (limited), work experience, and RFC.  The vocational expert responded that such an individual would be able to perform the requirements of representative unskilled occupations such as cashier, photocopy machine operator, and surveillance systems monitor.  Because these jobs exist in significant numbers in both the local and national economies, the ALJ found Plaintiff "not disabled."

*A. Finding that Plaintiff's Impairments Did Not Meet the Requirements of Listed Impairment 12.05C*

Plaintiff argues the ALJ should have found that his impairments met the requirements of listed impairment 12.05C.  A claimant must show that his impairment meets all of the specified medical criteria to establish a listed impairment.  See Deckard v. Apfel, 213 F.3d 996, 997 (8th Cir. 2000).  To meet the requirements of Listing 12.05C, Plaintiff must establish three elements: 1) mental retardation, i.e., significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., evidence demonstrates or supports onset of the impairment before age 22; 2) a valid verbal, performance, or full scale IQ between 60 and 70; and 3) a physical or other mental impairment that is severe.  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C.

Plaintiff relies on the IQ assessment performed by Dr. Halfaker showing a

7

Performance IQ of 68 and a Full Scale IQ of 68. The ALJ found that the IQ scores were invalid based on Dr. Halfaker opinion that there was a "high" probability of suggestibility, symptom magnification, and malingering. Furthermore, the objective tests measuring symptom validity and effort showed Plaintiff using borderline or a lack of consistent effort. Because Dr. Halfaker stated repeatedly that the results of the testing could not be relied on, the ALJ acted properly by finding the IQ tests invalid.[1] Accordingly, the ALJ properly found that Plaintiff had not established the requirements of Listed Impairment 12.05C.

*B. The Opinions of Drs. Radovanovitch and Casey*

Plaintiff argues that the ALJ did not give sufficient weight to the report of Dr. Radovanovitch, scoring Plaintiff in the second percentile in cognitive functioning. "A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998). Plaintiff referred himself to Dr. Radovanovitch for a psychological assessment. Plaintiff provided the doctor with no background medical records. The ALJ noted that by Dr. Radovanovitch's own report, the evaluation was "abbreviated" and she had difficulty getting him to complete even limited testing. He also noted that the examination did not include testing for the reliability of the information Plaintiff provided. The ALJ found that in light of medical records suggesting malingering by Plaintiff, the soundness of the conclusions drawn by Dr. Radovanovitch were called into question. Based on these considerations, the ALJ gave Dr. Radovanovitch's report the appropriate weight.

Plaintiff also argues the ALJ did not give proper consideration to treatment records provided by Dr. Casey. Dr. Casey opined that Plaintiff had very significant physical limitations, including range of motion problems and chronic pain. While Dr. Casey was Plaintiff's primary care physician, he had only a short-term relationship with

---

[1] Though not addressed by either of the parties or the ALJ, the Court also notes that even if Plaintiff's IQ testing in October 2003 were valid, Plaintiff has not provided any evidence that his impairment manifested before age 22, as required by Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

8

Plaintiff from which to base his opinion. Dr. Casey's opinion, therefore, is not entitled to controlling weight as a treating source. See Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (stating that a medical opinion was not entitled to controlling weight as a treating source when doctor had only met with claimant on three prior occasions). Additionally, the physical limitations described by Dr. Casey were not consistent with other evidence in the record. Accordingly, the ALJ acted properly in not relying on this opinion.

## III. CONCLUSION

The Commissioner's decision is supported by substantial evidence in the record as a whole, so his decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: November 1, 2007　　　　UNITED STATES DISTRICT COURT